This Court recognized in Lytle v. Carl that even minor acts can constitute retaliation sufficient to state a Section 1983 claim, and that while trivial acts of bad-mouthing do not suffice, engaging in campaigns of harassment and humiliation does. Similarly, in White v. Lee, this Court recognized that informal measures, such as invoking the threat of legal sanctions and other means of coercion, intimidation, and persuasion, can violate the First Amendment when they are intended to retaliate for, excuse me, or chill protected speech. If Ms. Jacobs and the county merely expressed their views about MHC's rent or sought to influence the outcome of deliberative, adjudicative, or policymaking decisions, they would have an ability to assert Nora Pennington as an affirmative defense. They did not do so, and they did not do so for a reason, and that is because Ms. Jacobs is a final policymaker for the banning MHC out of the county. This campaign included harassment and over-enforcement of the laws. Well, let me ask you about the over-enforcement. Is MHS, or I guess which now has a different name, claiming that it has a constitutional right to be free from inspection for seven years? No, we're not claiming that. We are claiming a right to be free from retaliation for protected speech. Here, there were no complaints from the residents about the conditions in the park. What about the sewage situation? The sewage situation was proven to be sabotaged by the resident who lived in that park. We submitted an affidavit that that resident stuffed a towel down the sewer in order to create a problem which created a pretext for an investigation. We also submitted evidence that Ms. Jacobs knew that the situation had been under control. We submitted an affidavit from the firm that went out and solved the problem, even though it was resident sabotage, and she publicly went on the air and accused MHC of lying about the status of the situation, when in fact, MHC had not lied. In fact, she said MHC deliberately lied. The 30B6 witness for the county on the left that, first of all, and this is at the record at page 64 in the excerpts of the record, that the only complaints before the inspection of Lamplighter was that a resident had a chicken and that another resident had built a home without a permit, and that these parks were not good candidates for inspections. He also testified at page 97 of his deposition at the record at page 66 to 67 that he could not identify a single park that was inspected outside the seven-year cycle without a complaint of a serious violation and that there were no such complaints at these parks prior to the inspection. On January 10, 2003, less than a few weeks before the inspections, Mr. Haas, who is the Deputy Director of the Department of Environmental Health, wrote an email to Ms. Adams, who is the Chief of Staff for Mr. Jacobs, and copied the Chief Administrative Office on it, and said, and I quote, we believe that a total inspection is not necessary. That's at the excerpts from the record at page 82. The record also shows undisputed statement of fact 15, that it was not normal weights and measures practice to inspect all meters in a park, and that gas meter support was a common violation, and that the MHC parks were the first parks ever cited across the board for such types of violations. Those are undisputed facts 57 and 59 in the record at 201. Counsel, what's your best case on municipal harassment that was compensated under 1983? In terms of damage, I believe that Lytle v. Carl is a very helpful case to us. I also think White v. Lee, which I mentioned previously. In a slightly different context, I think the Carpinteria case, which is not cited in this record, but is cited, I believe, in the City of the County of San Luis Obispo case. These are cases in which a local government official was held liable for essentially harassment or something comparable to what you have identified here. Right. In these cases, I think White v. Lee, for example, dealt with a situation where there was an investigation into speech by a party, and the investigation was so aggressive and excessive that it was found to be intended to chill, or at least raise tribal issues of fact as to whether it would chill. We're not on summary judgment here, are we now? That's correct, and that's why I think there are disputed issues of material fact that should be resolved by a trier of fact. To chill First Amendment speech is a highly factual issue, that it can seldom be proved by direct evidence. It's always going to be circumstantial, and that that is not an issue that lends itself to resolution on summary judgment. Well, let me ask you this. What authority do you have that routine business activities such as rent increase notices and correspondence with political figures is expressive speech, expressive conduct? Certainly, Your Honor. We cited in the letter to the Court, in response to the Court's inquiry about Nora Pennington, the 44 Liquor Mart, Inc. v. Rhode Island case by the United States Supreme Court in 1986. That case held that advertisements about the price of goods or services were protected First Amendment speech as commercial speech. But this is in advertisements. This is a statement by MHC to hundreds of residents as to its opinion as to the value of its property. Very similar to anybody who's selling a good or service. This is what it is putting out on the market and saying, this is our property or our good or our service, and here is the price that we're trying to set. That is a core protected element of the First Amendment. If property owners or people selling goods or services are not free to publicly state their opinion about the value of their own property, about the value of their goods or services, that is a fundamental freedom that would be lost that the Supreme Court has recognized in what I believe is a very parallel context here. So then if I take it a step further, if you send a bill to a tenant or a bill to a client or whatever, then why isn't that expressive conduct? Because that's the value of your service. Because this is an offer to the tenants just like the advertisement is an offer to the public by way of saying, here is what our opinion is as to the value of what we are offering to a large group of people in a free market system. This is our opinion as to the value of our property. It's not a statement of fact as you would have with a bill. But the person already has a relationship with you as opposed to going to the public at large and advertising. There is no obligation for them to pay that rent or to stay at the property. This is a statement of fact would be a bill because you're simply stating the fact this person owes you so much money. When you say my property or my goods are worth this much, this is my opinion about that, that is an opinion. And that makes it protected speech. Beyond that, the letters went further than just stating our opinion about the value of our property. It went on to assert that these were protected legal and economic interests in the property. If the park was condemned or there was eminent domain, the ability of MHC to express freely what it believed the value of its property was, would be critical to its ability to preserve the value of that property. And what's also significant here is MHC did not raise the rents by 25%, which was the accusation that was made. It expressed an opinion that the market was 25% higher than what the rent was. But it went on to say we're only going to implement 50% of the market this year. We're only going to raise our rents 12% this year, but we want you to know for future purposes it's our opinion that the rent should be 25% higher. Ms. Jacobs then said they've tried to raise their rents 25%, which simply was not true. And I'm going to see if that's criminal, and I'm going to nail them on every violation that I can possibly have, and I'm going to drive them out of the county. And that was her stated reaction. It wasn't lower your rents. It was I'm going to drive them out of the county, because they had the temerity to express their opinion about what they thought their land was worth. That's a protected right to go out and say I think my land is worth this much. And if public officials cannot only disagree with you, or not only propose legislation, but go beyond that to say you can no longer do business in this county, and I'm going to make your life so difficult that you will wish you never set foot in this county, because you had the temerity to express that opinion, then that steps over the line. Then that is seeking to chill and to retaliate for the expression of First Amendment speech. And that's precisely what occurred here. The facts are compelling. Ms. Adams, who is the chief of staff for Ms. Jacobs, said it would be a violation of the county code for her to request an inspection. And yet there are admissions that that's exactly what happened. Undisputed fact 109. Ms. Jacobs' staff requested weights and measures to inspect each and every one of these parks, even though there was no objective cause. The county says there were complaints. But the complaints were about the rent increase. There's no evidence of complaints about conditions in the park. So the notion that these agencies were responding to complaints about the conditions in the park is simply untrue, and at best a disputed issue of material fact. What happened is, at most there were complaints about the rent, which were precipitated by Ms. Jacobs asking for complaints. And the county's own 30B6 witness said, and put in writing, There was then a communication, as reflected in the opposition to undisputed facts 47 through 49, where there was a phone call between Ms. Jacobs' office and these enforcement agencies that she, under the code, is not supposed to be communicating with. She's supposed to go through the administrative office, and in them they told her that it is not an appropriate park for inspection. And she responded, In fact, in November, before there's any suggestion of complaints, before the sabotage with the sewer pipe at Rancho Valley, she went before the residents in response to the rent issue and said, That is classic over-enforcement and harassment that has as its object not the enforcement of the law, but to chill this party from expressing its opinion about its market rent. Counsel, I assume you've been discussing the First Amendment claim. What about back up to the Monell claim? You mentioned in passing that she was a final authority. Is that what you said? I have some trouble with that. How do we get there, given the fact that she's only one of the board of commissioners and a political type? Certainly, Your Honor, and I think to respond to that, it's important to focus on the broad expanse of the term policy within the meaning of Monell. In the city of St. Louis, the Supreme Court found that Monell violations can be based on, quote, isolated acts by government officials and recognize that, quote, an unconstitutional government policy could be inferred from a single decision taken by the It doesn't if she's the final policy maker in that area. And here, I think, is the key. That this case, her policy was a policy of driving MHC out of the county. It was a policy of silencing and chilling MHC. And in Lytle v. Carl, which I mentioned before, this court held for purposes of Monell liability, the term policy includes within its definition, not only policy in the ordinary sense of a rule or practice applicable in many situations, it includes a course of action tailored to a particular situation and not intended to control decisions in later situations, quoting the Pembauer case. And so someone may have authority on a particular issue or a particular area and not otherwise have authority beyond that situation. Ms. Jacob clearly was acting in a policymaking authority. The question is, was she the final policymaker? But there's no question that within the meaning of policy as laid out in those decisions, she was making a policy. She had a policy of I want to drive this company out of the county. She had a policy of I want them to back off and not express this opinion about the rent. And in fact, she invoked Section 47A as an immunity defense to the state law claims, which requires that she be acting in a policymaking authority. The question of final authority turns on two questions, and that is, was her exercise of policymaking discretion in any way constrained by or an implementation of policy set by somebody above her? That's one question. Or second, was it subject to review by somebody above her? This situation is not like your typical situation where you have employment policy set by somebody, and then you have people who implement or administer it. Or you have enforcement policy set by somebody, and you have someone who implements it or who administers it. Here we have a singular policy of driving somebody from the county, a policy of retaliating against them for their speech. There is nobody else who set policy in that area who constrained her. There was no check on her where she would have to go back and say, well, what's our policy on driving somebody out of the county or our policy on chilling somebody's speech? There was no other policy that she was implementing that would be set by a superior. She was not constrained by any policy set by a superior, nor was her decision-making subject to review by any other form of superior. She was the last word on these specific narrow issues. If it was an issue of employment policy, of course, the county board might set those type of policies. They might set other policies related to enforcement of the code. But on this particular policy, there was no superior who constrained her as a policymaker. Is there enough in the record for us to make that determination? I believe that there is. First, there is her own acknowledgment under oath that for issues related to concerns of her own constituents, that she was the mayor and city council all rolled into one. Now, she qualified and explained that in a later answer. But that was her answer in response to the very first question of describing her authority to act in her role as a superior. But is the county bound by her interpretation? What do we look to determine whether, in fact, she can, in effect, commit Monell violation here? It is an issue of state law, and one would look to the various codes and regulations, as well as to the course of conduct. All of that, I believe, is relevant to interpreting state law. There is no code, there is no law that entrusts policymaking as to this type of policy, i.e., driving somebody out of the county or chilling speech to anybody else. And that's why I think this case is relatively unique compared to the cases that deal with a firing, which always deals with employment policy, or enforcement by a sheriff. And the question is, if he's the sheriff, is he setting the policy, or is he just enforcing the policy? Counsel, you're down to two and three quarters minutes. You may wish to reserve. It's up to your choice. Certainly. To the extent that policymaking authority was reposed in the entirety of the council, and we don't believe it was, there would still be a factual issue as to whether, in this case, they delegated that authority to her, and that is generally viewed as an issue of fact, or whether they ratified what she did by passing legislation which authorized additional park inspections. And so we believe those are also issues of fact that are not susceptible to resolution on summary judgment. Finally, I would note, with respect to the defamation claims, which were simply stricken based upon anti-SLAPP, that the United States Supreme Court has held that calling someone, or saying that someone lied, is a statement that lends itself to a defamation case, and that is a defamation claim. They've held that in the Milkovich case, that either somebody lied or they didn't, that that's a statement of fact that's objectively provable or not. The district court relied on the Morningstar case, where the only reference to lie was in a headline to an opinion-based article that began with the phrase, lies, damn lies, and statistics, which was a parody on the Mark Twain phrase, and they had a court jester in the column next to it to show that this was, in fact, commentary and meant in humor. Nobody was accused of lying in the Morningstar case. On the other hand, in Milkovich, the United States Supreme Court dealt directly with someone being accused of having lied, and here the lie is a, I quote, deliberate lie to the county about the SOAR situation. That was a demonstrably false statement, and it states a very paradigm case for defamation and should not have been made. I'm happy to have time for rebuttal. Thank you. Thank you, counsel. We'll hear from the county. May it please the court. I'm William Johnson. I'm from the Office of County Counsel in the County of San Diego. I've listened to Mr. Bradford's argument, and nothing he's raised during his argument wasn't fully briefed in our briefs that we've submitted to the court. I do want to focus, if I might, just on what this case is about. What we have is a situation where MHC, the company, and you're going to have another case just following this case concerning their challenge to another rent ordinance in another county. Well, that's more of a takings claim. It's a different case. Exactly, but what we have here is this all started with some rent increases and some citizens bringing those rent increases to the attention of their counsel. And the result of that is basically three things. Some statements by Ms. Jacob that we'll talk about in a second. Some meetings that occurred to develop some options to approach how to remedy some of the situations that were brought to the attention of Ms. Jacob. Those have been characterized by MHC's counsel as a steering committee, but more appropriately brings into play what we're going to talk about in terms of the Norr-Pennington doctrine. And then lastly, the result and the sole result of all of this activity of which Mr. Radford just complained was some inspections of mobile home parks. The results of those inspections were that some citations were issued both to the owner of the park and to the residents of the park who live there and who had been told in advance that if you want the county to come out and inspect these parks because you think MHC's violating the law, you may be inspected as well and you may be cited. Is there a dispute of fact with respect to the sabotage of the sewer system? That was a conclusion that was drawn by this company based on their inspection after all these statements were made. It was their conclusion later on. There's no way for the county to verify one way or the other whether that's true. That was the conclusion that was drawn by the inspecting company. But it's really sort of irrelevant to what Ms. Jacob knew at the time she made her statement. And what she knew at the time of her statements, and it's all spelled out in the briefing, is initially there had been a statement by MHC's. But it could be relevant to the assertion you've just made with respect to the issuance of citations. If it turns out the citation was issued because of anti-rent action by way of sabotage, why that would go into the mix, would it not? I don't think there's anything in the record or any facts of which I'm aware that there were any citations one way or the other with respect to that incident. The citations that were issued were issued later. I think that incident took place in or around December of 2000. But see if there were evidence in the record that Ms. Jacobs was involved in telling a tenant, well, you know, I can't go, you know, I can't order it out there, but, wink, wink, if someone were to have a problem and then that person goes and stuffs something down their toilet and it's gone. And then there's a problem. Okay. And then the what if is then what constitutional violation is that if assuming that occurred? There's no evidence, first of all, that that occurred. And I understand the question. So we have statements, meetings, inspections. And then we look back at the Second Amendment complaint filed by MHC. They have a 1983 cause of action for equal protection. And they cite a case, the village of Olek, saying we were a class of one. The next claim they have is that they had a denial of their First Amendment right, denial of their First Amendment right, not retaliation, to express their opinion of rent. There's no evidence in this record that anybody, Ms. Jacob or anyone else, acted in any way to prohibit MHC from sending out the rent increase notices that were sent out or from expressing their opinion of rent. What MHC is really complaining about is statements made by others that disagree with their opinion of rent. In this situation, we have two sides that have First Amendment rights to express the opinions of rent that they want to express. Well, the characterization that Appellants' Counsel Mr. Bradford made of the notice that went out, it was their expression of what they felt the value of their property was. What's your characterization of what went out? It's contained in the record, and I think Mr. Bradford was slightly inaccurate in what the notice said. The notice said, we're going to impose a rent increase, and it varied from 21.6 percent, I think, up to 32.5 percent, depending on the space rent and the park that was involved. They're in line with the 25 percent midpoint that Ms. Jacob used in her statement. What they said is, not that we're only going to impose half of it. What they said was, we're going to impose 12 percent immediately in the one situation, and one year from now, we're going to impose the other half, 12 percent. So there was a 25 percent rent increase announced in that letter. It wasn't that our opinion is it's 25 percent and we're only going to impose half of it. They imposed, they sent the notice that they were going to impose the entire 25 percent. It was just going to be immediate, and then one year hence. Well, counsel, isn't there a fact question here with respect to what appears to be an extremely aggressive and allegedly vindictive role played by this county supervisor? Why shouldn't the jury get to hear the presentation made by the company in this situation? Why is this simply a matter of law? Well, two issues. There's the claims as to Ms. Jacob on the defamation that were dealt with by the district court on the slap motion. And I think that's been fully briefed, and the fact of the matter is that as strong of a language she used in her statements and her advocacy, it was all her opinions. Well, it's not just statements and advocacy. It's the allegation, at least, that she vindictively put various county agencies on, or put pressure on those agencies to make inspections that would not ordinarily have been made. Again, these are allegations, and so what troubles me a little bit is that this went off on a summary judgment. Well, let me address that specifically because this court has asked us to discuss the Norr-Pennington case. And we did not raise that as an issue. You did not assert that as a defense. But it does provide a way to look at what was going on here, and the record is... Well, why didn't you raise that? Well, because, again, it would have required an extension of that to a place it hadn't been before. And quite honestly, I don't think that the lawyers in our office that were looking at this through the years of litigation really thought it directly applied. And so I'll be candid with the court. But when you go back and look at this court's opinion where it's in the Manistee, I've got to make sure I say that right, town center case, where one government agency is petitioning another government agency. Before I received the court's notice, I was intending to, in this argument, analogize somewhat to the notion of writing your congressman. And anybody that's worked in government knows that a congressman who occupies the office as a legislature does not have final policy-making powers. He can make grants. Well, in this case, the assertion here is that she had the final authority with respect to this particular area of county government. Now, is that an accurate statement or not? It's completely inaccurate. What is accurate, and what she said in her deposition, is she is the representative of the 2nd District of the East County of San Diego. She is, for those folks that live in the unincorporated areas, she is their representative. There is no mayor, there is no city council, because they're not living in a city or anything else. But in addition to being representative of the 2nd District, doesn't she also have some assignments within the county government? No. She sits as one of the five members of the Board of Supervisors. And in this case, all she could do, and all she did in this case, strongly advocated, no question about that. But all she could do is, just like a congressman who gets a letter saying, I need something from Veterans Affairs, the congressman needs to contact Veterans Affairs, and it's the Veteran Affairs director that has authority over matters within Veterans Affairs. In this case, inspections of mobile home parks, whether it be the Department of Ag, Weights, and Measures that deals with the meters, or whether it be the Department of Environmental Health that deals with sewage issues and other things, the directors of those departments, reporting to the CAO, have final authority. What's a CAO? Chief Administrative Officer. And again, anybody that's worked in government knows exactly what was going on here. We had a very strong-willed congressman, legislator, Ms. Jacob, advocating on behalf of the county. On behalf of her constituents, and trying to get other departments to act within their areas of delegated authority. And what happened in this case is that those departments went out and inspected, at her request, at the request of complaints that she was receiving from the constituents, the residents of the park. They inspected the meters, cited ones that weren't in compliance. There's no fact, there's no even claim here by MHC. But what do the meters have to do with a rent increase? I've never understood that connection. Well, again, Mr. Heater would probably be a better one to answer this question, but when these residents come in with complaints, they then sit down, and everything they have to complain about, in terms of that park, they start spilling out their complaints. And what Ms. Jacob was experiencing, once she got the complaints about the rent increase, was complaints about conditions, complaints about, there's a variety of things that are all laid out in the briefing in this case, that all taken together were very insignificant. But those were all things that were being brought to her attention. Now, clearly, her policy, her intent, that Mr. Bradford calls her policy, was to push back. To MHC. She says, I'm going to drive them out. They weren't leaving. They're a big company, based in Chicago. Sam Zell runs the company, and you know from seeing some of the other opinions of this court, that they're fully capable of litigating with any county they choose in this state about rent control and other things. So what she was doing in this case was pushing back a little bit to this big company that had come in, acquired some parks, and immediately raised the rents, announced rent increases of 25%. Stirred up the pot with the residents, and she was dealing with her constituents, and made some strong statements. There's no question. They're in the record. They are in the record. But what about the timing of the inspections? Are there regulations concerning inspections? Where does this seven years come from? What's the cycle there? The statute required that parks be inspected no less than every seven years. That's a state requirement. And so the county departments, in this case, ag weights and measures and... So if you don't inspect every seven years, what happens? Then you violate the state law. But it's not that you can't inspect more often than that. If you lose money, if you don't inspect every seven, what happens? Or you get citations? Or what happens? I can't really answer that question. It's a requirement of state law that the county is charged with enforcing. And what recourse the state would have if the county didn't inspect every seven years is something I just haven't even considered. In this case, the record is that they were scheduled that way, but the record is also clear that if there was a complaint by one of the residents, I had a sewage spill or whatever it would be, there's a drainage problem in the park. We have mosquitoes in pooled water out at the park. A health issue like that, you'd go out and inspect more often than every seven years. But again, as I said, it's clear what was happening here. Ms. Jacob wanted these departments to implement their authority more frequently than seven years. And in these meetings that were being held, you had the representatives from the departments making sure that they weren't doing anything beyond what their legal authority was. And there's no evidence in this case that as a result of anything that Ms. Jacob tried to set in motion, that any county official did anything that was unlawful or anything beyond their authority, nor is there any evidence that anybody went out and singled out MHC. They singled themselves out by stirring up the rest. The implication in this litigation is that she singled MHC out, and she put the pressure on the county agencies to do inspections that they would not ordinarily have done. But all of that was a result of the first step, which was MHC getting its residents unhappy with it. Ms. Jacob was not involved in this at all until her constituents became unhappy with MHC and sought redress from their government officials. Did a county agency respond directly from a complaint by a constituent, or did they respond only after pressure by this supervisor? The actions that were taken here, ultimately, were the result of several months of complaints and involvement by Ms. Jacob and other things. You know, the rent increase notices went out in July of 2002, and these inspections started in January, February of 2003. So there were some things going on. I think you've answered my question. I understand your timeline, but the question is, what was her role with respect to these inspections? Were the inspections just simply in direct response to a disgruntled renter, or were they in response to pressure from her, or a request from her, or however you describe it? I think the record is fairly clear in this case that once this process started, that the complaints were going through her office, and that she was involved, whether she would have said — So the inspections were done at her request? At her request, based on the requests that were coming from the constituents. Well, isn't that enough to raise a question of fact? Well, I'd say as to what. And the question then is, what is the constitutional violation here, which loops back to what was alleged in the complaint in the first place? If MHC is saying, we were over-inspected, then you'd kind of look to, okay, over-inspection becomes a constitutional issue if they were either unlawfully inspected, and found somehow out of cycle, or somehow the county didn't have the authority to inspect, or were over-inspected in such a way as to constitute a taking of property in some manner. And there's simply no evidence that we've gotten to that point, and there's no evidence that the county of San Diego should be responsible, because Ms. Jacobs' activities in making the complaints and advocating for the complaints are not in her authority as a policymaker. She's one legislature that did not have final policymaking authority. If any of these directors, DEH, Department of Environmental Health, or Ag Rates and Measures, had concluded that what you're asking us to do is outside of our authority, their recourse is to report back to the CAO and say, we've got a member of the board here that's now asking us to do something we don't have authority to do. There would have been an internal county brouhaha about that, I suspect. But that's not what happened here. All of the inspections that were done at Ms. Jacobs' request were within the final policy, within the final discretion of the directors of those departments, within the policy that had been implemented by the full board of supervisors, delegating to the CAO and those directors that policy. So what we had here was not policymaking. Ms. Jacobs had her own idea, and her policy, or her view of the world, was that she wanted to push back to MHC, but the actual governmental action here was being done by those delegated persons that had authority to act within their discretion, based on policy that had been implemented by the full board of directors as to these inspections. If I understand Mr. Bradford's argument, the record would sustain an interpretation that these inspections, these activities that were done by these, let's say, autonomous departments, would not have been done but for her intervention, which he alleges constituted a campaign of harassment and vindictive conduct, which is compensable. So again, I come back to the question, isn't there a fact question? Well, a campaign, I mean, I'm going to use your words, a campaign of vindictive conduct, if Ms. Jacobs is engaged in such a thing, then you need to say, okay, what's the cause of action? There's statements, there's meetings, and there's inspections. Assuming that she put in motion inspections that were within the discretion of the government to act, they're not unlawful, and there's no constitutional violation. One of the members of the court asked Mr. Bradford, are you saying that MHC had a constitutional right to be free of inspections where those have been requested by constituents acting through their elected official? And the answer is no. It's just like my analogy to a congressman. The Director of Veterans Affairs may not have issued the benefit check to the constituent, except for the fact that the congressman picked up the telephone and advocated on behalf of that constituent. Well, let me ask you, what evidence of the alleged sabotage was there to those that decided, at the time they did the inspections, were they just presented with, okay, these people are complaining about there's a sewage backup, there's this, that, and the other, or did they also have evidence at that time that there was sabotage going on? There are two pieces that I have to answer. Obviously, there were three different mobile home parks that were involved, and they're laid out separately in the brief. The one particular event that led to the, that Mr. Bradford characterized as sabotage, was an event in one of the mobile homes that connects to the park's sewer system. And so there's, the park has responsibility of the sewer system up to where it joins the mobile home, and then the pipes go into that. And so there was a dispute between the owner of the mobile home park, MHC, and the owner of the mobile home itself as to where the problem was. Was it clogged in the, in backing up from something that had been clogged down, or was there something further down the line in the mobile home park in that particular instance? With respect to the other parks, what the complaints were were things like, we're getting bad odors, we don't think the park's sewer system is being well-maintained, those kinds of things that then get reported to Ms. Jacob, that then get reported back to DEH to go out and inspect the sewer system of the park, not of the individual mobile home. So it's really different, and the issue then of whether there was sabotage turns on MHC's hired company that went out to fix the problem, saying, we think it was because somebody stuffed a towel down the pipe rather than anything else. Was that before or after the inspections? That incident was well before, a month or two before the inspections of all three parks, and what was inspected in those situations, again, was not the mobile homes themselves, but the park's sewer system. Counsel, I'll let you go a minute and a half over time. Your time has expired. Thank you very much. We'll hear from Mr. Bradford. You have a little rebuttal time. Thank you, Your Honor. Section 501.9 of the county charter specifically provides that no member of the board or its staff shall give orders, instruct, or interfere publicly or privately with an appointee of the chief administrative office. These department heads wore such offices that should not have been directly communicated with by her staff. Sherman Adams, the chief of staff, admitted it would be a violation of law to request these inspections. She also admitted that they did request these inspections. Undisputed Fact 109 not only indicates that they requested the weights and measure inspections, but that this was the first time in the county's history that a supervisor had ever requested such an inspection. The only reason to request weight and measure inspections was to retaliate for, and in her own words, drive MHC out of the county because she did not care for its views about the market rent. MHC owned these parks for 30 years. It didn't just buy these parks and try to raise the rent overnight. It was very specific that its view was that the rent should be 25% higher, and that's what offended her. Beyond that, this was not just the full park inspections. By the way, of each and every one of MHC's parks, those are still the only parks ever to have been inspected outside the seven-year cycle without any serious violation being reported or complained of in advance of the inspection. There was a fourth park in the city of Santee, which weights and measures went out and inspected. It's in the county, but not within her jurisdiction. She precipitated that inspection as well because it happened to be an MHC park, and when she went to weights and measures, she asked that every MHC park, even those not in her jurisdiction, be inspected because they were within weights and measures' jurisdiction. Kennedy. Counsel, I've got a question with respect to your jurisdictional argument, or at least the jurisdiction over this area. You heard Mr. Johnson's comment. He disputes your assertion that she was the final authority in that area. Do you have a response to that? I do, and first I want to note that the First Amendment case against her does not depend on that issue. The case against the county does depend upon the Minnell issue and whether she was the final policymaker. She was the final policymaker because, A, she was making policy. I don't think the county disputes that she was making policy, and it's critical here that DEH and the other enforcement agencies were not adjudicative bodies, legislative bodies, or policymaking bodies in their own right. Unlike the traditional Nora Pennington situation, she was not going to another adjudicator or another policymaker. She was going to enforcement agencies, and she wasn't asking for legislation or adjudication. She was asking for enforcement. The question is, was there somebody above her? Was she the final person in that chain of policymaking? The only candidate for an entity to be above her would be the county board as a whole, and her statement that she is the mayor and city council as to problems unique to her area is an indication that, as practical sense would tell you, on an issue of this nature, who is going to overrule her? Who is going to say? Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and we will proceed to hear argument in the San Luis Obispo County case, Equity Lifestyle Properties v. County of San Luis Obispo.
judges: Hall, O'scannlain, Callahan